**Harold UNTERBERG**

v.

**The UNITED STATES.**

**No. 70-66.**

United States Court of Claims.

July 16, 1969.

Paul R. Harmel, Washington, D. C., attorney of record, for plaintiff; Robert Granville Burke, New York City, of counsel.

LeRoy Southmayd, Jr., Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Richard Arens with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on May 10, 1968. Exceptions to the commissioner's opinion, findings and recommended conclusion of law were filed by plaintiff and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

ARENS, Commissioner:

Plaintiff seeks disability retirement pay from July 5, 1946, when he, having been found to be physically qualified therefor, was released from active duty in the Navy in the grade of Lieutenant Commander, USNR. He contends that the actions of the Department of the Navy in denying him disability retirement were arbitrary, capricious, not supported by substantial evidence and legally erroneous.

The principal question presented is whether at the time of his release, plaintiff was physically fit to perform his duties.[1]

The facts, detailed in the accompanying findings, may be summarized as follows:

At the time of his entrance upon active duty in the fall of 1942, plaintiff had a history of varicose (dilated or distorted) veins, but the Navy examination, in which he was found physically qualified, revealed that the condition of his veins was then normal.

Over the course of the several succeeding months, as commanding officer of armed guard units of Navy vessels, plaintiff was obliged to stand long hours of watch without respite and experienced severe recurring pain in his right leg. Periodic Navy examinations revealed marked varicosities in his right leg which was treated by injections, after which in each instance he was found fit for and returned to duty. In July 1944, he was transferred to Navy aviation duty, and from that time until his terminal physical examination in May 1946, the several physical examinations which were given him revealed no disqualifying defects. The only reference to his veins in the reports of these examinations was that their condition was normal. The report of the terminal physical examination, in which he was found physically qualified for release from active duty, described the condition of his veins as follows: "Discoloration due to injection of varicosities rt. leg," but the summary of defects stated, "No defects."

At all times during his period of active service, plaintiff performed his duties satisfactorily. Indeed, the record reveals that his performance was exemplary.

In July 1947, a year after his release from active duty, plaintiff was examined by the Navy and found physically qualified for active duty training. The report of the examination noted that the condition of his arteries and veins was normal. A year later, plaintiff submitted to the Chief of Naval Personnel in connection with his acceptance of an appointment to the permanent rank of Lieutenant Commander in the Naval Reserve, the following statement:

I, Harold (n) UNTERBERG, LCDR, AL, 0183671 USNR do hereby certify that upon my release from active duty I was determined to have been physically qualified for release and, in my most recent physical examination I was determined to have been physically qualified to perform all the duties of my rank at sea. I further certify that subsequent to the latest determination, to the best of my knowledge and belief, my physical condition has (NOT) changed materially.

In September 1948, he was examined by the Navy and found physically qualified for active duty. The report of the examination noted that the condition of his arteries and veins was normal and that he had no disqualifying defects.

In November 1949, plaintiff began visits to a private physician who noted that he had large varicose veins of his right leg. From time to time, thereafter, the physician administered injections to plaintiff's leg.

1. The applicable Navy Regulations pertaining to fitness for service appear in finding 20. Section 964 of Naval Courts and Boards (1937) provided that the physical disability warranting retirement "must be a permanent incurable disease, or injury of such character as absolutely to disqualify for duty on the active list."

In November 1952, plaintiff was given a quadrennial examination at the headquarters of the Third Naval District, New York. The report of the examination noted that he stated that his health was good, with no complaints reported, that he had no defects, and that he was found physically qualified to perform all the duties of his rank at sea and on foreign shore.

In June 1959, plaintiff was given a quadrennial examination at the headquarters of the Third Naval District, New York. The clinical evaluation, under item 30, "Vascular System (Varicosities, etc.)" showed a checkmark indicating normal. Item 34 read: "Have you ever had any illness or injury other than those already noted? (If yes, specify when, where, and give details)." He checked "Yes" and added the following: "34—As noted in U.S. Naval Medical Record." Item 35 read: "Have you consulted or been treated by clinics, physicians, healers, or other practitioners within the past 5 years? (If yes, give complete address of doctor, hospital, clinic, and details)." He checked "No." He was found qualified for retention USN (Inactive) and active duty at sea and on foreign service.

It was not until October 1961, over 15 years after his release from active duty, that plaintiff applied to the Board for Correction of Naval Records for a change in his records to show that he was retired for physical disability. In support of his application, he attached his own affidavit and statements of three doctors. One of the doctors had been treating plaintiff "on and off" for the previous 12 years for acute exacerbation of an old phlebitis (inflammation of a vein) of his right leg. Two of the doctors had first seen plaintiff in 1961 and generally described the veins in his right leg as "increasingly more conspicuous and incompetent," and stated that the veins in his right leg would, unless eliminated by surgery, "undoubtedly become progressively larger and will interfere with his usual activities by producing complications in the future."

About a year later, plaintiff submitted to the Correction Board an additional statememt of the doctor who had been treating him, in which he expressed the opinion that the nature of plaintiff's duty in the Navy contributed to and was an aggravating factor in the resulting deterioration of the veins in his right leg, and that "his right leg became progressively worse lately." Plaintiff also submitted a statement, by a fourth doctor who stated that he first examined plaintiff in May 1953, at which time there was a rupture of a saphenous vein with hemorrhage to the external surface of the right leg. It is to be noted that none of the doctors above referred to expressed an opinion as to plaintiff's fitness as of the time of his release from active duty in July 1946.

In August 1962, the Naval Physical Disability Review Board issued an advisory opinion in which reference was made to the several physical examinations in which plaintiff was found fit. The Review Board further stated that the information supplied by plaintiff failed to reveal any probative evidence which would tend, in any degree whatever, to support his contention, and accordingly concluded that plaintiff was, as of July 5, 1946, the date of his release from active duty, physically qualified to perform all the duties of his rank at sea and on foreign shore.

In the fall of 1962, the Veterans Administration awarded plaintiff a 50 percent service-connected disability from November 1961 for varicose veins, based upon an examination of October 30, 1962.

At a hearing, conducted in December 1963, by the Board for Correction of Naval Records, plaintiff testified and also presented the testimony of a fifth doctor, Dr. Robert Bell, who testified that he first examined plaintiff in 1963, that he had also examined plaintiff's medical records, and that it was his opinion that at the time of plaintiff's release from active service his leg condition constituted a permanent, incurable disability and that plaintiff was not at

the time of his release physically qualified for duty. The Correction Board then sent plaintiff's entire record to the Chief of the Bureau of Medicine and Surgery, with the following statement:[2]

\* \* \* \* \* \*

The Board was impressed with the oral argument and testimony presented at the hearing. It was inclined to recommend to the Secretary of the Navy that Petitioner's naval record be corrected to show entitlement to physical disability retirement benefits. However, before making a favorable recommendation it desired your opinion in view of the sworn testimony of Dr. Bell, a former member of your staff. \* \* \*

Thereafter, the Bureau of Medicine and Surgery replied that at the time of plaintiff's release from active service, "He no doubt had venous varicosities, incompetent venous valves, scarring from previous phlebitis, and discoloration" (referred to in the testimony of Dr. Bell before the Board), that because of the developments since his release, it would be difficult to find him physically fit 15 years later, but that the question primarily at hand was plaintiff's fitness to perform his duties at the time of his release, that during his active service he performed his duties, and that "in spite of repeated treatment and official medical evaluation, fitness for duty was never officially challenged," and that he was discharged physically fit.

Subsequently in June 1964, the Correction Board recommended, and the recommendation was approved by the Secretary of the Navy, that no change in plaintiff's naval record was warranted. About a month later, plaintiff underwent surgery for the removal of the large saphenous vein of his right leg.

At the trial in this court, plaintiff testified and produced the testimony of two medical specialists, one of whom had treated plaintiff with injections beginning in November 1949, and the other of whom had performed the surgery on plaintiff's right leg in July 1965. These specialists took issue with certain interpretations appearing in plaintiff's Navy medical records, but neither of them expressed the opinion that at the time of his release from active duty, plaintiff was not physically fit.

Defendant produced the testimony of a specialist who stated that varicose veins are curable either by injections or by removal of the veins, and were curable in 1946, and that there are men in the naval service performing full active duty after having undergone surgery for stripping of the saphenous veins. From a study of plaintiff's records, the specialist expressed the opinion that plaintiff had varicose veins without significant symptoms upon entering the Navy in 1942; that thereafter, with increased activity, he developed muscle strain; that at the time of plaintiff's release from active duty in July 1946, his varicose veins were satisfactorily controlled by the injections and that at that time he had no evidence of varicose veins and was physically qualified for active duty. He further testified that varicose veins can be diagnosed by mere visual observation, without the need for other physical examination or test.

 In considering the legal principles applicable to this case, we are guided by the repeated pronouncements of this court as to the need for clear and convincing evidence of arbitrary or capricious action before the court will reverse a finding by the Secretary of the military service or by a Correction

---

2. Plaintiff contends that at this juncture, the Correction Board had "reached a determination on the merits" of his case, and that the advisory opinion of the Bureau of Medicine "upon which the Correction Board solely relied when it denied plaintiff's application must be declared a nullity and any action taken by the Correction Board on the basis thereof must be declared to be in violation of law." This contention is clearly without merit. Towell v. United States, 150 Ct.Cl. 422 (1960); Uhley v. United States, 147 F. Supp. 497, 137 Ct.Cl. 275 (1957).

Board that a person was fit for military service when released to inactive duty. It is only where the decision is clearly unsupported by substantial evidence or when there was a noncompliance with applicable laws and regulations, that this court may interfere. Ward v. United States, 178 Ct.Cl. 210 (1967); Furlong v. United States, 153 Ct.Cl. 557 (1961). Nor will this court substitute its judgment for that of the armed services in determining general fitness for military duty. Stephens v. United States, 358 F. 2d 951, 174 Ct.Cl. 365 (1966). Moreover, the fact that a plaintiff's condition may have deteriorated subsequent to his release from service is not of itself determinative of the issue as to his fitness at the time of his release. Johnston v. United States, 157 Ct.Cl. 474 (1962).

In the instant case, plaintiff was physically examined on several occasions during the period of his active service and found physically qualified for the active service which he performed in an exemplary manner both prior to and after his release in July 1946. See Snell v. United States, 168 Ct.Cl. 219 (1964). Plaintiff contends that some of the physical examinations given him by the Navy were cursory. There is, of course, the presumption that the medical officers who examined him faithfully performed their duties. Wesolowski v. United States, 174 Ct.Cl. 682 (1966). There is testimony in the record, moreover, that varicose veins can be diagnosed by mere visual observation, without the need for other physical examination.[3] Furthermore, plaintiff's own affirmations contained in his service record, regarding his fitness for duty, dissipate much of the force of his argument in this court of unfitness for duty. One cannot fail to be impressed also, by the fact that within a period of two or three years after his release from active duty, plaintiff was examined twice for active duty training and found physically qualified, and that it was not until October 1961, 15 years after his release, that he applied to the Correction Board. It is not without significance that only one of the several specialists upon whom plaintiff relied to establish his case before the Correction Board, expressed the opinion that he was unfit at the time of his release from active duty, and that neither of the specialists who testified on plaintiff's behalf at the trial in this court expressed this opinion. The testimony at the trial by defendant's specialist that plaintiff was physically qualified for active duty at the time of his release was not contradicted, although plaintiff's specialists did differ with him over certain aspects of plaintiff's medical records.

■ The determination by the Veterans Administration of a 50 percent service-connected disability, based upon a physical examination of October 1962, is, of course, not dispositive of the issue of plaintiff's fitness or unfitness for military duty. Holliday v. United States, 128 Ct.Cl. 647 (1954).

■ Although, as stated by the Bureau of Medicine and Surgery, plaintiff did have certain physical deficiencies at the time of his release, it is clear that plaintiff has not established that these resulted in his unfitness for duty. Plaintiff has not discharged the very substantial burden of proving that the action of the Correction Board and the Secretary of the Navy should be here

---

3. Plaintiff also contends that under the provisions of the manual of the Medical Department of the Navy (finding 20, paragraph 21110) he, as an officer should have appeared before a Board of Medical Examiners at the time of his terminal examination, and that although the report of the examination was signed by the three members of the Board, he was actually examined by only one member. It is clear that there was substantial compliance with the provisions of the manual and that plaintiff was not prejudiced thereby. See McCallin v. United States, 180 Ct.Cl. 220 (1967). The instant case is obviously distinguishable from Russell v. United States, 183 Ct.Cl. 802 (1968), in which the plaintiff therein, who had evidence of mental illness, was not given an examination by a competent psychiatrist as required by the regulations.

overturned. Wood v. United States, 176 Ct.Cl. 737 (1966); Johnston v. United States, supra.

### FINDINGS OF FACT

1. (a) Plaintiff challenges the actions of the Department of the Navy, including the action of the Board for Correction of Naval Records, as approved by the Secretary of the Navy, in denying him disability retirement from July 5, 1946, the date he, having been found to be physically qualified therefor, was released from active duty in the grade of Lieutenant Commander, USNR.

(b) In this court, plaintiff seeks to recover disability retirement pay from the date of his release from active duty. The amount of recovery, if any, is reserved for further proceedings.

2. (a) On May 20, 1940, plaintiff was examined by the Navy and found physically qualified for appointment as Ensign C-V (X) USNR. The examining doctor made a notation in plaintiff's medical records that he had "varicose veins,[1] right leg, no symptoms."

(b) On April 21, 1942, he was examined by the Navy and found physically qualified for appointment as an officer Class D-V (S) USNR. The only defect noted was that he was 20 pounds overweight, but this was not disqualifying.

(c) On May 15, 1942, he was reexamined by the Navy for appointment as an officer D-V (S) and found physically qualified for appointment. The report of the examination, under "History of illness or injury" recorded "usual childhood diseases. Varicose veins." The condition of his veins was noted as "normal." The summary of defects was recorded as "20 pounds overweight standard, not disqualifying."

(d) On August 17, 1942, he was examined by the Navy and found physically qualified for active duty. The condition of his veins was recorded as normal. On the same day, he accepted an appointment as Ensign in the United States Naval Reserve.

3. (a) On September 10, 1942, plaintiff reported for active duty at the Navy Training School, South Boston, Massachusetts, where he was given instruction in armed guard duties. Thereafter, he was ordered to report for additional instruction at the Armed Guard School, Little Creek, Virginia.

(b) On October 23, 1942, following a period of time during which he noted burning sensations in his right leg and engorgement of the veins of that leg, he sought medical assistance at the base dispensary where the medical history noted:

Diagnosis: VARICOSE VEINS, Right Leg. #249. E.P.T.E. Not misconduct. Patient has known of varicosities for past 3 years. During civilian life he was doing office work and was on his feet very little. Entered the Navy about Sept. 15, 1942 and after few weeks of being on feet he noted burning of his right leg and engorgement of the veins. This has become progressively worse.

P.E. Enlarged veins extending from Scaphenous [sic] opening down entire right leg.

T-10-23-42: Transferred to NNH. for disposition and treatment.

(c) On the same day, October 23, 1942, he was transferred to Norfolk Naval Hospital where a diagnosis of varicose veins in both legs #249, E.P.T.E. was made and where the medical history further noted:

* * * Examination showed marked varicosities of great saphenous vein rt. leg. There was some swelling of ankle but no ulceration or scaling.

It was decided that local injections should be given (since there was no involvement above the knee) rather than high ligation. Sodium Morrhuate injections were given at regular intervals and an elastoplastic bandage worn during the period of treat-

---

1. Varicose veins are veins which are dilated or distorted.

ment. Treatment is now complete and the results are very satisfactory. Indicated laboratory work done—negative. 11–2–42: Kahn negative. No complaints.

11–11–42: To Duty. Fit for same.

(d) On November 10, 1942, in order to expedite the treatments he was given double injections, with the result that he could not walk, but was confined to bed.

(e) On November 11, 1942, he was taken by ambulance from Norfolk Naval Hospital to the base at Little Creek, Virginia, and was there confined to bed for 9 days with a nurse in attendance around the clock. The medical history of this admission reads:

Diagnosis: PHLEBITIS,[2] RIGHT LEG #232. Duty—not misconduct. Patient was discharged from Norfolk Naval Hospital 11–11–42 following injection therapy for varicose veins right leg. Complains of pain and burning.

P.E. Thrombosis veins popliteal space, and anterior surface of leg. Treated with heat and elevation.

11–19–42: Discharged to duty, well.

(f) Shortly after his discharge from the Norfolk Naval Hospital, plaintiff was transferred to the Armed Guard Receiving Station, Brooklyn, New York, where he experienced recurring pains in his right leg. He accordingly reported to the Armed Guard Infirmary where he was given injections periodically in his leg.

4. (a) On February 19, 1943, he was assigned as commanding officer of the armed guard unit of the United States Armed Merchant Vessel, SS ARGON, which was engaged in convoy duty as an escort tanker. The ship and its convoy were in combat or subjected to imminent submarine attack over long periods during which plaintiff was obliged to be on his feet standing watch or directing gunfire. He had severe pain in the calf of his right leg and his foot swelled so that he could not remove his boot. Medical attention was unavailable to him.

(b) On May 18, 1943, he was granted a 10-day period of "survival leave" during which he reported to the dispensary at the Navy Armed Guard Center in Brooklyn, New York, where he received injections in his right leg.

(c) Following the termination of his leave, he was assigned as commanding officer of the armed guard unit of the United States Merchant Vessel, SS ESSO PROVIDENCE, an escort tanker which was also subjected to frequent submarine attack. During this tour of duty, he was again obliged to be on his feet for long periods during which he experienced severe pains in his right leg on an almost daily basis, and was without the benefit of medical attention. Upon return of the ship to New York, he was detached in order to obtain medical treatment for his leg.

(d) On July 20, 1943, he reported to the medical officer at the Navy Armed Guard Center, Brooklyn, New York, where he received injections in his leg and was referred to the Varicose Vein Clinic of the Brooklyn Naval Hospital for further examination and advice. The referral card noted:

7–20–43. In Nov 1942 officer received injections varicose veins (no ligation) both legs. Left leg has been alright since. Right leg did not improve greatly and he was in Brooklyn Naval Hospital where ligation was advised because "of poor circulation." This in Dec. 1942. Now complains that right ankle swells when he is on his feet much, has shooting and crampy pains up to the groin. Refer to Varicose Vein Clinic at BNH, for exam and advice.

(e) The medical report of the Varicose Vein Clinic of the Brooklyn Naval Hospital noted:

7–23–43 Phys. exam reveals dilated veins below knee on rt. leg. Perthes

---

2. Inflammation of a vein.

is neg. Dorsalis pedis felt. Circulation of feet good.

*Impression*—Varicose veins. Believe he should have a saphenous ligation as deep circulation is adequate.

(f) On the same day, July 23, 1943, he returned to the Armed Guard Receiving Station, Brooklyn, where the doctor who had been treating him advised him that a ligation [3] could not assure a cure and that there was no definite cure for the condition from which he was suffering. He was given further injection and told by the doctor that he would have recurring attacks, and that he should "do the best you can."

(g) On July 31, 1943, he was assigned as commanding officer of the armed guard unit of the SS ASTEC which was bound for Bizerte, North Africa, and which was subjected to submarine and air attacks. He was again obliged to stand long hours of watch without respite and experienced severe shooting pains in his leg which swelled and made it difficult for him to get off his shoe and boot. His only medical relief was through self-administered aspirin.

(h) On October 19, 1943, he was detached as commanding officer of the armed guard unit of the SS ASTEC and was ordered to the United States Naval Mine Warfare School, Yorktown, Virginia, for instruction in the use of a secret antisubmarine weapon to be installed aboard armed merchant vessels undertaking extra-hazardous routes.

(i) On October 20, 1943, he was physically examined at the Navy Armed Guard Center, Brooklyn, New York, for promotion to Lieutenant (jg). The report of the examination stated that his general health was excellent, the condition of his arteries and veins was normal, no defects were noted, he was fit to perform active duty at sea or on foreign service, and that he was found physically qualified to perform all duties as Lieutenant (jg) at sea.

(j) Upon completion of the course of instruction at the United States Naval Mine Warfare School, Yorktown, Virginia, he was assigned as commanding officer of the armed guard unit of the Armed Merchant Vessel SS JOHN La FARGE which was engaged in the "Murmansk run" and which was subjected to submarine and air attacks. He was again obliged to stand long hours on watch in severe cold weather and experienced progressively increasing pain and cramps in his right leg and groin. At intervals when the SS JOHN La FARGE was in New York, he was given injections in his right leg at the Armed Guard Center dispensary.

5. (a) Following his tour of duty on the SS JOHN La FARGE, he was ordered to the Aerial Navigation School at the Naval Auxiliary Air Facility, Shawnee, Oklahoma, for instruction.

(b) On July 24, 1944, he reported for duty at the Naval Air Station, Boca Chica, Key West, Florida.

(c) On December 6, 1944, he was given an annual physical examination by the Navy, and no disqualifying defects were noted.

6. (a) On January 5, 1945, plaintiff was examined by the Navy and found physically qualified for promotion to Lieutenant. No disqualifying defects were noted.

(b) On October 3, 1945, he was treated at the United States Naval Air Station, Key West, Florida. The medical report gave the diagnosis as cellulitis [4] of the right thigh, and further stated that he had developed a small boil on the inner surface of his right thigh, that it had progressed in size despite ambulatory treatment and that it was accompanied with marked pain. After bed rest, incision and drainage, and application of hot soaks, he was much improved and discharged to duty under treatment on October 5, 1945.

(c) On October 30, 1945, he requested retention on active duty for a period of

---

3. Removal of the veins.

4. Inflammation of cellular tissue.

six months beyond November 1, 1945, his normal relief from active duty date, provided he was appointed to a "spot" promotion as a Lieutenant Commander.

(d) On December 27, 1945, he was physically examined for temporary promotion to Lieutenant Commander, United States Naval Reserve. The report of the examination stated that the condition of his veins and arteries was normal, that he had no disqualifying defects and that he was physically qualified for the temporary promotion. On the same day he was temporarily appointed to the rank of Lieutenant Commander, United States Naval Reserve, effective December 18, 1945, for a "spot" appointment.

7. (a) On April 10, 1946, plaintiff was examined at the United States Naval Air Station (Boca Chica Field), Key West, Florida, and found physically qualified for transfer to a separation center.

(b) On May 4, 1946, he was given a terminal physical examination at the United States Naval Officers' Separation Center, Washington, D. C. He pointed out to the examining physician from his medical record the history of phlebitis and varicosities that he had during his period of active duty. The examining physician visually examined his right leg but did not touch the leg or conduct any tests, nor did the examining physician suggest to him that he was in need of additional medical examinations before being released from active duty. In the report of the physical examination under "History of illness or injury," the following was noted:

UCD—Tonsillectomy 1933. Cellulitis, rt. leg 1946. Varicose veins, bilateral —injected 1942. Phlebitis, rt. leg 1942.

The condition of his veins was described as follows: "Discoloration due to injection of varicosities rt. leg." Under "Summary of defects" was stated, "No defects." He was found physically qualified for release from active duty. The report of the physical examination was signed by a Board of Medical Examiners, consisting of two officers of the medical corps and one officer of the dental corps.

(c) On the same day, May 4, 1946, he was transferred to terminal leave, at the expiration of which, on July 5, 1946, he was released to inactive duty and reverted to the rank of Lieutenant, United States Naval Reserve.

(d) He subsequently testified before the Board for Correction of Naval Records and in the trial conducted in this court that shortly after his release from active duty he periodically experienced recurring severe pains in his right leg.

8. On July 6, 1947, plaintiff was examined at the United States Naval Air Station, New York, New York. The report of the examination noted that the condition of his arteries and veins was normal, that he had no disqualifying defects and that he was found physically qualified for 2 weeks active training duty.

9. (a) In July 1948, plaintiff submitted to the Chief of Naval Personnel in connection with his acceptance of an appointment to the permanent rank of Lieutenant Commander, United States Naval Reserve, the following statement:

I, Harold (n) UNTERBERG, LCDR, AL, 0183671 USNR do hereby certify that upon my release from active duty I was determined to have been physically qualified for release and, in my most recent physical examination I was determined to have been physically qualified to perform all the duties of my rank at sea. I further certify that subsequent to the latest determination, to the best of my knowledge and belief, my physical condition has (NOT) changed materially.

(b) On September 10, 1948, he was examined at the United States Naval Air Station, New York, New York. The report of the examination noted that the condition of his arteries and veins was normal, that he had no disqualifying de-

fects and that he was physically qualified for active duty.

10. In November 1949, plaintiff began visits to a private physician who noted that he had large varicose veins of his right leg. From time to time, thereafter, the physician administered injections to plaintiff's leg.

11. On November 17, 1952, plaintiff was given a quadrennial examination at the headquarters of the Third Naval District, New York. The report of the examination noted that he stated that his health was good, with no complaints reported, that he had no defects, and that he was found physically qualified to perform all the duties of his rank at sea and on foreign shore.

12. On June 3, 1959, plaintiff was given a quadrennial examination at the headquarters of the Third Naval District, New York. The clinical evaluation, under item 30, "Vascular System (Varicosities, etc)" showed a checkmark indicating that it was normal. Item 34 read: "Have you ever had any illness or injury other than those already noted? (If yes, specify when, where, and give details)." He checked "Yes" and added the following: "34—As noted in U.S. Naval Medical Record." Item 35 read: "Have you consulted or been treated by clinics, physicians, healers, or other practitioners within the past 5 years? (If yes, give complete address of doctor, hospital, clinic, and details)." He checked "No." He was found qualified for retention USN (Inactive) and active duty at sea and on foreign service.

13. (a) On October 2, 1961, plaintiff filed an application with the Board for Correction of Naval Records, in which he requested that his records be changed to establish that he was retired for physical disability. In support of the application, he attached his own affidavit and statements of the following doctors: Robert A. Nabatoff, Harold B. Eiber, and Eugene Zele.

(b) Dr. Nabatoff's statement, dated August 1, 1961, read:

To whom it may concern,

Mr. Harold Unterberg was seen by me on 7/10/61 for a vascular examination.

Examination revealed large varicose veins. The peripheral arterial circulation was normal. The past history included a severe attack of thrombophlebitis on 11/10/42, while on active duty in the U.S. Navy. Varicose veins were first noted in a prior Navy medical examination and, according to the history, the phlebitis developed following an injection of sclerosing solution for the varicose veins. The phlebitis caused inflammation of the veins in this extremity and marked swelling developed. The edema[5] was due to additional venous insufficiency. The phlebitis gradually subsided but the varicose veins have gradually increased in size. At present they are very large and a high ligation and stripping procedure are necessary in order to eliminate venous stasis and prevent recurrent attacks of phlebitis or other complications of varicose veins. Unless they are eliminated, the varices will undoubtedly become progressively larger and will interfere with his usual activities by producing complications in the future.

(c) Dr. Eiber's statement, dated September 7, 1961, read:

This patient consulted me on August 21, 1961, complaining of pains and varicose veins of the right leg.

He gives a history of having first noticed the presence of the varicose veins while in the U.S. Navy in 1942, for which he received sclerosing therapy.

He developed a complicating periphlebitis and cellulitis of the right leg at the sites of the injections.

Since that time the veins have become increasingly more conspicuous and incompetent. He was advised to

---

5. Swelling.

seek surgical advice. It is my belief that the condition which began in 1942 and the ensuing complications from the sclerosing therapy have contributed to the existence of his present condition.

(d) Dr. Zele's statement read:

To Whom it May Concern:

Mr. Harold Unterberg has been under my care on and off for the past 12 years for acute exacerbation of an old phlebitis of right leg, which he allegedly contracted while serving in the U.S. Navy.

(e) On November 15, 1961, he filed a claim with the Veterans Administration. Service connection was initially denied for varicose veins.

(f) On December 28, 1961, the Board for Correction of Naval Records referred his records to the Naval Physical Disability Review Board for an advisory opinion relative to his physical condition at the time of his release from active duty on July 5, 1946.

14. (a) On July 11, 1962, plaintiff submitted to the Board for Correction of Naval Records a supplemental affidavit to be attached to his application for correction of naval records. Attached to the supplemental affidavit were a series of exhibits consisting of voyage reports prepared and submitted by him while he was on active duty, a statement of Dr. J. S. Bullock and an additional statement from Dr. Eugene Zele, all of which were forwarded by the Correction Board to the Review Board.

(b) Dr. Bullock's statement, dated May 23, 1962, read:

My records reveal that the above named person has a history of long standing varicosed veins in the right leg, the first incident of which was in November 1942 when injections of the veins were made. The patient also told me that he developed infectious phlebitis and was admitted to a hospital for treatment. Subsequently there was fast deterioration of the venous return prior to his discharge from the U.S. Navy in 1946.

My first examination of the patient was made in May 1953 at which time there was a rupture of a saphenous vein with hemorrhage to the external surface of the right leg.

(c) Dr. Zele's statement, dated June 22, 1962, read:

Mr. Harold Unterberg, of 5 Harcourt Road, Scarsdale, New York, has been under my care on and off since November 1949.

I noted on the first examination of the patient large varicous [sic] veins of the right leg, and also that the right ankle and right leg were edematous.

The past history of the patient revealed that he had developed a thrombo-phlebitis in November, 1942 while on active duty in the United States Navy; that he was hospitalized for treatment and subsequently, while still in the Navy, received sclerosing therapy periodically for these veins. The patient also told me of the nature of his convoy sea duty in the North Atlantic and Arctic waters during the period of 1943–1944, the length of time required to stand watches and the recurring attacks of pain experienced while on active duty, and the frequency of these attacks while at sea.

It is my opinion that the nature of his active duty in the Navy, which necessitated his standing for long periods of constant vigil, contributed to and was an aggravating factor in the resulting deterioration of the veins in his right leg.

I advised treatment; and from that period to date Mr. Unterberg has been under my care for this condition. From time to time, injections of sclerosing solution for the varicous [sic] veins have been administered. He is receiving such treatment at present; his right leg became considerably worse lately.

(d) On August 7, 1962, the Naval Physical Disability Review Board issued an advisory opinion in which particular

reference was made to the several physical examinations in which plaintiff was found fit. The Review Board further stated that the information supplied by plaintiff failed to reveal any probative evidence which would tend, in any degree whatever, to support his contention, and accordingly concluded that plaintiff "was, as of July 5, 1946, the date of his release from active duty with the Naval Reserve, physically qualified to perform all the duties of his rank at sea and on foreign shore." The Review Board further concluded that since the records were voluminous and complete, the interests of plaintiff and the Government were so well protected that a formal hearing with personal appearance was not necessary.

(e) On August 8, 1962, the Board for Correction of Naval Records furnished plaintiff with a copy of the advisory opinion of August 7, 1962, and informed him that he could introduce additional documentary material or file a statement of rebuttal.

(f) On August 10, 1962, the Veterans Administration awarded plaintiff service-connection for varicose veins of his right leg and evaluated the same as being disabling to a degree of 20 percent. Plaintiff appealed this evaluation.

(g) On November 15, 1962, the Veterans Administration awarded plaintiff a 50 percent service-connected disability from November 11, 1961, for varicose veins, right leg and thigh, based upon a physical examination of October 30, 1962. The rating decision read in part:

At the last VA examination, surgical examination disclosed sacculated and tortuous varicosities of the lower third of the right thigh and the right leg. The examination also disclosed healed ulceration and pigmentation and pitting edema of the lower third of the leg. The varicosities were 1 cm. in diameter. Deep circulation was not competent.

(h) On the same day, November 15, 1962, he submitted to the Board for Correction of Naval Records a rebuttal to the advisory opinion of the Naval Physical Disability Review Board, and requested a hearing before the Board for Correction of Naval Records. Attached to the rebuttal was a letter, dated September 4, 1962, of Dr. Robert A. Bell, which letter read in part as follows:

You now present disability, due to varicose veins and phlebitis right leg, of such degree that I am certain you can not perform duty as a line officer at sea or on foreign shore. The records indicate you had some prominent veins on entry into active service but no disability therefrom. The records also show that you received treatment in service for varicose veins, including the injection of sclerosing [sic] solution. It appears that thrombophlebitis developed and by July, 1943 you suffered from swelling of the right ankle whenever your were on your feet much and from shooting and crampy pains up to the groin.

It is noted that Dr. Zele examined you in 1949 and found large varicose veins right leg and edematous swelling of the right leg and ankle.

It is my opinion that you present an issue which is timely, pertinent, substantive and deserving of adjudication. There are necessarily some areas of conflicting data and opinions in the file which require evaluation, weighing and adjustment. This type of analysis cannot be undertaken in the depth and breadth necessary to permit of a just decision unless you are allowed to be present and to offer testimony.

It is my strong feeling therefore that you should request the Board to grant you the courtesy of a formal hearing. In the event a favorable reply is forthcoming I will be pleased to assist you in presenting all of the factors in your case to the Board.

(i) On November 23, 1962, the Board for Correction of Naval Records fur-

nished the Bureau of Medicine and Surgery the files and records in the case, including the advisory opinion of the Naval Physical Disability Review Board and plaintiff's rebuttal, and requested the Bureau to render an advisory opinion relative to plaintiff's physical condition at the time of his release from active duty on July 5, 1946.

15. (a) On January 1, 1963, plaintiff was transferred to the Retired Reserve, USNR, in the rank of Lieutenant Commander, pursuant to 10 U.S.C., §§ 274 and 1376(a) (1964 ed.).

(b) On September 23, 1963, the Chief of the Bureau of Medicine and Surgery sent an advisory opinion to the Chairman of the Board for Correction of Naval Records which read in part:

> The records reveal that petitioner served on active duty from 10 September 1942 to 5 July 1946. During that time he did have difficulty with varicose veins, and spent a total of 42 days on the sick list (12 of these were for German measles). Comparatively frequent outpatient care was rendered, but there is no record of any appreciable amount of time lost, and he did serve for 15 months as commanding officer of armed guard detachments aboard merchant vessels on some of the most dangerous convoy routes. The annual physical examination reports, promotion physical examination reports on three occasions, and the examination for release from active duty list no disqualifying defects.
>
> \* \* \* \* \* \*
>
> From a review of all the records, this Bureau is of the opinion that petitioner's physical condition in 1946 was not of such a nature as absolutely to disqualify him for duty on the active list (Naval Courts and Boards, 1937 Edition, page 429). In fact, the records reflect an exemplary performance of duty. The petition is therefore considered to be without merit, and it is recommended that it be denied.

(c) On December 16, 1963, the Board for Correction of Naval Records held a hearing at which plaintiff appeared with counsel and testified at length concerning his naval service, the inception and progression of his physical disability and the treatment which was afforded him by the Navy. He further testified as to the nature and extent of the physical examinations which were given him by the various medical representatives of the Navy and which he described generally as cursory.

(d) Dr. Robert A. Bell also testified at the Board hearing on behalf of plaintiff. He retired from the naval service on May 1, 1955, after having served for several years in the Division of Physical Qualifications of the Navy Department. He testified that he was familiar with the Navy's requirements respecting the physical ability of its personnel to perform their assigned duties, and from early 1949 until 1955, he personally passed on cases of "fitness" which he defined as "the ability of the individual to perform the duties of his rank or grade, or rate, at sea or on foreign shore." He further testified that he was familiar with the established Navy definition of "incapacity warranting retirement" as set forth in Section 964, Naval Courts and Boards, 1937 Edition, page 429, and that the criteria for retirement thereunder, i.e., whether the disease or injury was curable or incurable, was not used during his time in the Navy in passing upon the physical fitness of naval personnel.

(e) Dr. Bell further testified that he first examined plaintiff in 1962 and from his examination found plaintiff's physical condition to be essentially excellent with the exception of his right lower extremity which presented severe varicose veins. He described a varicose vein and its etiology in the following language:

> \* \* \* Well, a varicose vein is a dilated vein. It comes about largely (perhaps almost always) because some

of the valves in the vein become incompetent and allow the blood to flow back down toward the foot—speaking of the lower extremities. * * * These veins all have valves in them and the valve is so structured that as the blood is pushed back toward the heart, the valve opens and permits the flow. And the flow of the blood toward the heart is activated by the constriction of the muscles in the leg, and when the muscles relax the force pushing the blood back toward the heart disappears and this blood will run back toward the foot unless these valves close and prevent it from doing so. So if you have a valve that's deficient this blood simply tends to go back toward the foot each time the muscles relax and there's no pumping pressure left. This is what is behind varicose veins.

Now there's another important factor to be considered. There are two main systems of veins in the lower extremities returning the blood toward the heart, or at least, up to the pelvis. There's a deep system of veins and there's the superficial system. These two systems both have valves in them, and the superficial one as described here is the large saphenous vein. Between these systems as you go down the thigh and the leg, there are communicating veins.

Now the communicating veins are so built into the structure that they carry blood from the superficial system into the deep system, and there's a valve which prevents the reflux flow back into the superficial system.

When the muscles contract then there's more pressure on the deep system pushing this blood back toward the heart, and so the arrangement of these communicating veins allows for a more efficient system of getting this blood back.

Generally speaking, you'll find that when an individual complains of cramping pains in the calf muscles or when he develops pigmentation of the skin in the ankle and foot that there's some deficiency in the valves and communicating veins and a reflux of blood from the deep venous system into the superficial system and, of course, it produces these unsightly dilated tortuous varicosities that are apparent just under the skin.

(f) Dr. Bell stated that he had examined plaintiff's medical records and expressed the opinion that at the time of his release from active duty on July 5, 1946, he was not physically qualified for duty at sea; and that plaintiff's leg condition constituted a permanent disability, was not curable but became progressively worse. He expressed the opinion that the physical evaluation made by the Navy that plaintiff's venous system was normal and that he had no defects was inconsistent with the facts appearing in his medical record. He stated that plaintiff could not have the symptoms which he had without a deep vein involvement, but that certain medical records stated that these deep veins were adequate.

16. (a) On January 2, 1964, the Board for Correction of Naval Records sent the transcript of the hearing, together with plaintiff's medical record, to the Chief of the Bureau of Medicine and Surgery. The chairman stated:

> * * * * * *
>
> The Board was impressed with the oral argument and testimony presented at the hearing. It was inclined to recommend to the Secretary of the Navy that Petitioner's naval record be corrected to show entitlement to physical disability retirement benefits. However, before making a favorable recommendation it desired your opinion in view of the sworn testimony of Dr. Bell, a former member of your staff. * * *

(b) On March 2, 1964, the Chief of the Bureau of Medicine and Surgery sent to the Chairman of the Board for Correction of Naval Records a lengthy

advisory opinion which discussed in detail the essence of the medical records and the testimony before the Board. This advisory opinion stated in part:

\* \* \* Although at times both the symptomatology and objective changes are either not referred to at all in his record or are given only passive comment, it must be granted that it was present. Although symptomatology waxes and wanes, anatomic damage and the scars of healing are not evanescent. Thus, a medical expert must assume, and do so with confidence, that at the time of party's discharge physical examination, he no doubt had venous varicosities, incompetent venous valves, scarring from previous phlebitis, and discoloration. As discussed, and for various reasons, edema may not have been present at the time of the May 1946 examination. Further, the records do not convince that deep venous incompetence was present. The above concessions should be promptly granted as they are sufficiently supported by record. Further dwelling upon the question of their presence and chronology is very liable to be misleading from the essential question at hand. The question, primarily at hand, is one of physical fitness to do work, to perform duties and not primarily whether or not a defect or disability is present, was present, did exacerbate, etc. etc.

\* \* \* \* \* \*

\* \* \* Here, it is believed, lies the crux of the matter. Party had an insignificant lesion prior to entry into the service. His lesion became intermittently symptomatic during service. Treatment was given with, of course, only limited improvement. A cure was, of course, seen by no one. Less than satisfactory improvement was had. Duties were performed. In spite of repeated treatment and official medical evaluation, fitness for duty was never officially challenged. He was discharged physically fit. With time, of course, as is seen in many cases the lesions progressed, and additional complications ensued. These developed over a period of approximately 15 years to such an extent that a question of physical fitness could not be legitimately raised. It would be difficult at this time to find him physically fit, however, 15 years ago based upon the evidence and official notations on record he was not only found fit, but it is understandable why he was found fit.

\* \* \* \* \* \*

Party's performance while on active duty is seen to be quite admirable and evocative of all sympathy and consideration. Progression of his lesion in recent years since discharge is regrettable and not unusual but certainly not predictable in an individual case. Although sympathy and supportive compensation is called for, and perhaps due, it cannot be legally supported in the channel petitioned in his application to the Board for Correction of Naval Records. Therefore, this Bureau is obligated to find that the merit of the case as argued for correction of records is unsupported. It is therefore recommended that the petition be denied.

(c) A copy of the advisory opinion of the Bureau of Medicine and Surgery was furnished to the plaintiff who, through counsel, submitted a rebuttal thereto for consideration by the Board. Accompanying the rebuttal was a further statement by plaintiff's medical expert, Dr. Robert A. Bell dated March 27, 1964, which addressed itself to the advisory opinion and in which Dr. Bell again reiterated his testimony that he was confident plaintiff suffered from defective valves in the communicating venous system in 1944–1945 and 1946 which allowed blood to flow back into the superficial venous system right leg from the deep venous system. Dr. Bell affirmed his opinion that such pathological physiology had to be present to cause the venous disability which plaintiff was suffering from in those years. He

again voiced the opinion that "it was the overall severity of this condition which made you unfit in 1946 to perform duty at sea."

(d) On June 19, 1964, the Chairman of the Board for Correction of Naval Records sent to the Secretary of the Navy its report on plaintiff's case, together with a number of enclosures, and the Board decision that no change, correction or modification of plaintiff's naval record was warranted.

(e) On June 25, 1964, the Secretary of the Navy approved the action of the Board for Correction of Naval Records, and shortly thereafter, the Executive Secretary of the Board so advised plaintiff.

17. On July 15, 1965, plaintiff underwent surgery for the removal of the large saphenous vein of his right leg.

18. On February 4, 1966, the Veterans Administration issued a rating decision which stated:

Notice of Disagreement; claim for increase.
Evaluation of varicose veins of right leg and thigh.

The veteran submitted a statement from Dr. Robert A. Nabatoff, dated 1–5–66, showing that the veteran had surgery for varicose veins of the right leg at Mt. Sinai Hospital on 7–15–65. The veteran still has intermittent discomfort in his leg as a result of the previous scar tissue, and that it is essential that he report regularly for observation and possible treatment, since only in this way will it be possible to keep the leg well. At the last visit on 1–5–66, he still had marked discomfort in the right thigh, and was advised to avoid prolonged dependency of the legs.

The statement of Doctor Nabatoff does not show any clinical findings involving the varicose veins of the right leg and thigh that are more disabling than was noted on the recent VA exam of 10–19–65.

The rating of 11–8–65, assigning 20% from 2–1–66 for varicose veins of the right leg and thigh is confirmed and continued.

19. (a) At the trial in this court, plaintiff testified substantially as he had previously testified before the Board for Correction of Naval Records, and produced as expert witnesses, Dr. Eugene Zele and Dr. Robert Nabatoff.

(b) Dr. Zele a New York City physician who first examined plaintiff in connection with his varicose veins in November 1949, testified that he made a diagnosis at that time of large varicosities of the right leg with edema [6] and discoloration; that he recommended an operation for removal of the large saphenous vein, but since plaintiff declined the operation, he then advised injection treatments; that varicose veins are not curable but become progressively worse unless operated on; that the medical records which referred to plaintiff's venous system as being normal were inconsistent with the facts; and that plaintiff's condition at the time of his separation from the naval service constituted a permanent disability.

(c) Dr. Nabatoff, a New York specialist in vascular surgery, who on July 15, 1965, performed the surgery on plaintiff's right leg, testified that if the surgery had not been performed, plaintiff would have been susceptible to phlebitis or ulceration of the ankles; that the edema which occurred in plaintiff's leg in November 1942, meant that he had insufficiency of the deep veins; and that if edema persists for more than six to twelve months it usually persists permanently.

(d) Commander Lindsay Clonts Getzen, Medical Corps, United States Navy, a specialist in vascular surgery, was produced as a witness by defendant. He testified that varicose veins are curable either by injections or by removal of the veins, and were curable in 1946; and that there are men in the naval service performing full active duty, including

6. Swelling.

sea duty after having undergone surgery for stripping of the saphenous veins. From a study of plaintiff's records, Dr. Getzen stated that at the time of plaintiff's release from active duty in July 1946, he did not have a disability which was a permanent incurable disease, or injury of such character as absolutely to disqualify him for duty on the active list, and that he was physically qualified for release from active duty. Dr. Getzen observed that plaintiff had visible varicose veins without significant symptoms upon entering the Navy in 1942; that thereafter, with increased activity, he developed muscle strain; that the injection treatments satisfactorily controlled the varicose veins; that plaintiff had no deep vein involvement because this would be inconsistent with stripping of the superficial veins; and that plaintiff had no evidence of varicose veins at the time of this release from active duty. He further testified that the varicose veins can be diagnosed by mere visual observation, without the need for other physical examination or test.

20. Section 4 of the Naval Aviation Personnel Act of 1940, 54 Stat. 864, as amended by the Act of June 20, 1949, 63 Stat. 201, 34 U.S.C. § 855c–1 (1952) provides, in part, as follows:

All officers, nurses, warrant officers, and enlisted men of the United States Naval Reserve or United States Marine Corps Reserve, who—

(1) if called or ordered into active naval or military service by the Federal Government for extended naval or military service in excess of thirty days, suffer disability or death in line of duty from disease while so employed; or

(2) if called or ordered by the Federal Government to active naval or military service or to perform active duty for training or inactive-duty training for any period of time, suffer disability or death in line of duty from injury while so employed;

shall be deemed to have been in the active naval service during such period, and they or their beneficiaries shall be in all respects entitled to receive the same pensions, compensation, death gratuity, retirement pay, hospital benefits, and pay and allowances as are now or may hereafter be provided by law or regulation for officers, warrant officers, nurses, and enlisted men of corresponding grades and length of service of the Regular Navy * * *.

The following provisions of the manual of the Medical Department, United States Navy (September 25, 1945) read as follows:

2117. *Retirement of Officers.*— Physical examinations for retirement shall be conducted in accordance with the instructions in paragraph 21110, in Naval Courts and Boards, and in Chapter 44, Navy Regulations.

\* \* \* \* \* \*

21110. *Physical Examination of Officers Prior to Resignation, Discharge, Dismissal, or Retirement for Age or Failure of Promotion.*—In General, the type of examination to be given is that prescribed for enlisted men prior to discharge or retirement (par. 21118) except that officers, not including midshipmen, shall appear before a board of medical examiners. The examination may be conducted at a naval hospital if the officer so elects. The report on Navmed-Y shall be submitted to the Bureau, and the results of the examination entered in the Health Record. Whenever physical defects are discovered which may have serious import, the officer shall be transferred to a naval hospital for medical survey. A report on Navmed-M shall be submitted to the Bureau on all general service personnel not physically qualified for duty at sea or on a foreign shore, special service personnel who are not physically qualified for duty ashore, and all personnel of the retired list not physically qualified for the duties assigned.

This is considered necessary for the protection of individual officers and their dependents as well as the Government.

\* \* \* \* \* \*

21118. *Physical Examination of Enlisted Men Prior to Discharge or Retirement.*—21118.1. Every enlisted man on active duty not discharged for physical disability shall be given a thorough physical examination by a medical officer prior to his discharge or retirement from active service. Whenever practicable, each man should be examined by two medical officers and a dental officer. A careful note of all physical defects, however trivial, and other data shall be made in the Health Record Navmed-Y shall be submitted to the Bureau except when personnel being discharged are to be immediately re-enlisted. If a physical disability is found which is sufficient to disqualify the individual for re-enlistment or for continuation in the service, or if a "Special Assignment" enlisted person has incurred a disqualifying disability, he must be examined by a board of medical survey before discharge or release from active duty.

21118.2. The nature and location of any defect, wound, injury, or disease shall be stated in the Health Record, and in the report of medical survey when indicated, together with the opinion of the medical officer as to whether the wound, injury, or disease is likely to result in death or disability, was due to misconduct while in the service, and was incurred in, or aggravated by, service (par. 3319.9).

21118.3. When an enlisted man of the Navy is examined for transfer to the Fleet Reserve, a report of the physical examination shall be submitted to the Bureau. If the man is physically qualified for duty at sea this report shall be submitted on Navmed-Y, but if the man is not physically qualified for duty at sea this report shall be submitted on Navmed-M. (See, also, par. 2215.5.)

## PART III, CHAPTER 3, THE MEDICAL SURVEY

333. *Composition of Board.*—A board of medical survey shall consist, when practicable, of three medical officers. If it is inconvenient to detail three medical officers, two will suffice. In extreme cases, or on board a ship on detached service, the survey may be held by the medical officer of the ship (Art. 1198, Navy Regulations).

\* \* \* \* \* \*

3311.2. When an officer candidate or midshipman has been undergoing treatment at a naval hospital for a severe or possibly incapacitating condition which may disqualify him for appointment, he shall be ordered before a board of medical survey before being returned to duty.

\* \* \* \* \* \*

Section 964 Naval Courts and Boards (1937) reads:

964. *Incapacity warranting retirement.*—The physical disability must be a permanent incurable disease, or injury of such character as absolutely to disqualify for duty on the active list. Deafness, defective vision, and incurable organic diseases are examples of such a disability. If, however, the disease be curable or of such a character as to yield to treatment, then, even though a cure may require considerable time, the disability is not permanent. The test is: Is the disease or injury curable or incurable? If it be curable within a reasonable time, the officer should not be retired.

21. Plaintiff has not established that the actions of the Department of the Navy, including the action of the Board for Correction of Naval Records as approved by the Secretary of the Navy, in denying him disability retirement, were arbitrary, capricious or unsupported by substantial evidence.