John Peter ANDREWS

v.

The UNITED STATES.

No. 588–82C.

United States Claims Court.

Nov. 28, 1983.

Nicholas Gilman, Washington, D.C., for plaintiff.

M. Susan Burnett, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant. Lt. Cdr. John S. Groat, Department of the Army, Jacksonville, Fla., of counsel.

## OPINION

LYDON, Judge:

Plaintiff, a member of the Naval Reserves, seeks to recover disability benefits and special damages as a result of injuries he suffered in a jeep accident which occurred during a weekend when he was assigned inactive-duty training with elements of a Marine Corps Reserve unit. Both parties have moved for summary judgment, having agreed that there are no material facts in dispute.

Plaintiff claims entitlement under 10 U.S.C. § 6148(a) (1976), which provides in pertinent part that: "A Member of the Naval Reserve * * * who is ordered to * * perform inactive-duty training, for any period of time, and is disabled in line of duty from injury while so employed * * * is entitled to the same pension, compensation, * *, and hospital benefits as are provided by law

or regulation in the case of a member of the Regular Navy * * * of the same grade and length of service * * *." Defendant opposes plaintiff's claim to disability benefits. The issue to be decided is whether plaintiff is entitled to disability benefits given the circumstances under which he incurred his injuries.

Upon consideration of the submissions of the parties and after oral argument, it is concluded that plaintiff's motion for summary judgment should be granted.

## I.

Plaintiff enlisted in the United States Naval Reserve on February 24, 1975, for a period of 6 years. Under this enlistment, plaintiff was required to perform an initial period of active-duty training. He also obligated himself to satisfactory participation in the Ready Reserve which required attendance annually at 48 drills of the unit to which he was assigned (inactive-duty training) and performance of not less than 14 days of active duty for training each fiscal year during the term of his enlistment.

Plaintiff, a reservist hospital corpsman, was administratively joined to the Second Marine Division (MED) located at Huntington, New York, and was performing his drills with the Headquarters and Service Company, 2nd Battalion, 25th Marines, a Selected Marine Corps Reserve Unit located in Garden City, New York. In March 1980, the Commander of plaintiff's Reserve unit requested authorization to utilize Camp Smith in Peekskill, New York for inactive duty training for the period May 2, 3, and 4, 1980. In this request, the Commander advised that some 138 officers and enlisted men would be in attendance, and that billeting would be required but that the mess hall would not be required. The time schedule set forth in this request stated that the main body of the unit would depart from Garden City at 2100 hours on May 2, 1980 for Camp Smith, and would return to Garden City from Camp Smith at 1200 hours on May 4, 1980.

On April 27, 1980, plaintiff was given inactive-duty training orders for the period May 2–4, 1980. He was directed to muster in Garden City, Long Island, New York at 2200 hours (10:00 p.m.) on May 2, 1980, where he would be transported by bus to Camp Smith in Peekskill, New York, some 75 miles away. Plaintiff was to be billeted at Camp Smith and was to participate in inactive-duty training at the Camp. The training orders provided that participants in the training exercise would have a box lunch on Friday evening, a hot meal Saturday morning, C-Rations (MCI w/heat) on Saturday noon and evening, a hot meal Sunday morning, and a box lunch Sunday noon. The orders further provided that plaintiff was to be returned to Garden City on May 4, 1980, at 1100 hours (11:00 a.m.). Plaintiff complied with these orders and arrived at Camp Smith on the night of May 2, 1980, with his reserve unit.

On Saturday, May 3, 1980, tactical training exercises for plaintiff's reserve unit commenced at 0935 hours (9:35 a.m.) and ended at approximately 1647 hours (4:47 p.m.) when the unit "went 'administrative' for purposes of the CPX * * *." The parties were unable to provide information as to the meaning and intendment of the preceding quoted language. It would appear that the training exercises were secured at 1800 hours (6:00 p.m.) and that the participants in the training exercise were thereafter permitted base liberty and C-Rations were distributed or made available.[1]

Lance Corporal Kenneth M. McAndrews (McAndrews) was a member of the communications platoon assigned to the training exercises. He and other members of this platoon remained apart from the other training participants at a retransmission site to set up an antenna. Around 2300 hours (11:00 p.m.) McAndrews met plaintiff and two other marines. McAndrews had

---

1. Plaintiff concedes that C-Rations were distributed at this time but states that plaintiff "did not receive any." There is no record support for the statement that plaintiff "did not receive any." Nor is there anything in the record as to why plaintiff "did not receive any," if such was the case.

been assigned a vehicle, a MCR Radio Jeep with no radio attached, relative to his participation in the training exercise. He offered plaintiff and the two marines a ride to the Post Exchange which, it was determined, was closed at that time.[2] They advised McAndrews that they desired to seek food. At or about 2235 hours (10:35 p.m.) a senior non-commissioned officer noted that the three marines were tired and hungry. Since food was not available on the base at the time, they agreed to ride with McAndrews, in the vehicle assigned to him, to go off base in search of a restaurant serving food, referred to as a "chow run".[3] The group left the base at about 2335 hours (11:35 p.m.) and drove to a restaurant in Cold Spring, New York, a 25-minute drive from the base, where they ate and had beer with their meals.[4]

After eating, the group, with McAndrews driving, left the restaurant to return to the base. On the return trip, McAndrews, at or about 0150 hours (1:50 a.m.) attempted to pass another vehicle, lost control of his jeep, which overturned, and the accident in question resulted.[5] As a result of this single vehicle accident, plaintiff suffered serious injuries. The three marines also suffered some degree of injury. The accident was investigated by members of the New York State Police.

Plaintiff was taken, initially, to a civilian hospital, Peekskill Community Hospital, from the accident scene, and was later transferred, at about 0400 hours (4:00 a.m.) on May 4, 1980, to a more sophisticated medical facility, Phelps Memorial Hospital in North Tarrytown, New York. On May 9, 1980, plaintiff was transferred to the United States Public Health Service Hospital on Staten Island, New York, where he remained until July 31, 1980.

As a result of the May 4, 1980, accident, plaintiff suffered head injury and concussion, spinal meningitis caused by the ehmophilus influenza virus, a fracture of the middle third of the left clavicle, chronic otitis media of the left ear, post-traumatic seizure disorder and headaches caused by head injury, and a sprained right ankle. Plaintiff claims that he presently is disabled by loss of hearing and balance control in the left ear, by nerve damage, and by chronic pain.

2. Some of the documentation submitted by the parties in support of their respective motions was illegible. As a result, the parties must bear the responsibility for the court's ignoring or misreading of statements the parties referred to in their factual statements, if the parties feel such is the case, because of the court's inability to decipher the illegible or faintly reproduced documents in question.

3. The record indicates that during the evening of May 3, 1980, senior non-commissioned officers (NCOs) had left the base in military vehicles to eat in civilian restaurants and thereafter returned to base. A non-commissioned officer, SSgt Ralph R. Martens (Martens) noted that a number of military vehicles had entered and departed the area in the hour preceding 2335 hours (11:35 p.m.). Martens noticed McAndrews driving the jeep at about 11:35 p.m., but since McAndrews was dressed in utilities and did not act in any way which would indicate that he was not authorized to be in the vehicle, he did not question his authority to leave the area in the vehicle. The investigating officer recommended that Martens receive a punitive letter of reprimand for failing to inquire of McAndrews why the vehicle was not being "staged" (parked for the night). The officer assigned to investigate the accident that later occurred was of the view that the jeep assigned to McAndrews was a tactical vehicle committed to the training exercise and that its use for reasons other than the purpose intended constituted misappropriation of government property. However, the tenor and totality of the report of the investigating officer suggests that the use of military vehicles on training exercises was not clearly defined and controlled. As a result, the thrust and substantive import of the above view by the investigative officer is minimal to say the least.

4. While there were a number of eating places closer to the base in Peekskill, New York, some less than a mile away, McAndrews was not familiar with that section of New York and instead of going left to Peekskill, when he exited the base, he went right to Cold Spring, New York. The record does not indicate how many, if any, of these closer eating places in Peekskill were actually open for business at that late hour.

5. The area where the accident occurred had a posted speed limit of 20 miles per hour. The road was a twisting, winding, two-lane road with dips, hills and blind curves. The two lanes were separated by a double yellow line.

Under military regulations, an incident involving injury to a reservist occurring during a period of inactive duty training, or a question of whether an injury to a reservist was incurred during a period of inactive duty training was to be investigated. *See Manual Of The Judge Advocate General* (Navy), § 0911(d) (1978). A "JAG Manual Investigation" was an administrative fact-finding undertaking. *Id.* at § 0201a(2). This administrative fact-finding undertaking was designed to provide convening and reviewing authorities with adequate information upon which to base decisions in the matter involved. The fact-finding body was administrative and not judicial. Its opinions, when expressed, did not constitute final determinations or legal judgments, and its recommendations, when made, were not binding upon convening or reviewing authorities. *Id.* at § 0201(c).

A fact-finding body had to be convened and the commanding officer had to make findings concerning misconduct and line of duty when the injury to a reservist was incurred under circumstances which suggested that a finding of misconduct might result, or the injury was incurred under circumstances which suggested that a finding of not in "line of duty" might result. *Id.* at § 0814(a). The fact-finding body was to determine facts relating to whether the injury in question was due to the reservist's own misconduct; whether the injury was due to intentional misconduct or willful neglect of the reservist within the meaning of the disability separation statutes; whether the injury was incurred in the line of duty while employed on inactive-duty training; and in what degree any commendatory or adverse action respecting the reservist should be taken. *Id.* at § 0202(e).

In accordance with the regulations discussed above, a Line of Duty/Misconduct

Investigation was conducted relative to the accident and resulting injury suffered by plaintiff on May 4, 1980, pursuant to the request of the Director, Headquarters, 1st Marine Corps District, Garden City, New York. The investigation was conducted by Chief Warrant Officer Francis E. Toomey (Toomey).

Toomey noted, in stating his opinions, that there was no strong viable method of control over the military vehicles used in training once they had been dispatched from Garden City to Camp Smith,[6] that the welfare and comfort of junior enlisted men, such as plaintiff, was sadly neglected by the Staff Non-Commissioned Officers and that there was little or no follow-up on the part of some platoon and section leaders. Toomey opined that had there been satisfactory performance in these three areas, the accident in question and resulting injuries would not have taken place.

Toomey was of the opinion "[t]hat the injuries sustained by Hospitalman John Peter Andrews [plaintiff herein] * * * be considered as being 'not in the line of duty' and 'not due to the member's own misconduct.'" Toomey's opinion, *supra,* was ostensibly based on his view that plaintiff was in an unauthorized absence status at the time and place of the accident and thus recommended that plaintiff be charged with violation of Article 86 of the Uniform Code of Military Justice, "Absence without leave," 10 U.S.C. § 886 (1976).

Toomey's Investigative Report was thereafter forwarded to and reviewed by the convening authority and appropriate superior authorities in the chain of command. The report was forwarded from one level of command to another by endorsement relative to appropriate action to be taken. In the first endorsement to Toomey's report,

---

**6.** In the *Recommendations* portion of his investigative report, Toomey recommended that the unit in question create, publish and give internal distribution to a "Standard Operating Procedure" governing its field operations; that all military vehicles considered tactical come under the cognizance and control of the Motor Transport Officer regardless of the "tasking out" of the vehicles to other sections within the

Battalion/Company; and that the Motor Transport Section of the Battalion be made aware of the proper method of dispatching vehicles and that a dispatcher be assigned to control vehicles during all exercises, and any period of duty for training. In short, Toomey felt that use of vehicle guidelines during inactive-duty training was lacking.

dated June 20, 1980, by the Director, Headquarters, 1st Marine Corps District, Garden City, New York, the convening officer disagreed with Toomey's opinion, *supra,* and stated that in his opinion "the injuries incurred by * * * [plaintiff] were incurred in the line of duty and not due to [his] own misconduct." The Tenth Endorsement to Toomey's Report, dated November 17, 1980 was from the Commander, Naval Base, Philadelphia, Pennsylvania, to the Judge Advocate General of the Navy. In this endorsement, the Commander stated in pertinent part:

It is my opinion that the unauthorized absence of the subject members, LCPL Hammon; LCPL Zuzeck and HN Andrews [plaintiff herein], did not materially interfere with the performance of required military duties. Therefore the injuries incurred by the above listed service members are determined to be incurred in the line of duty, not due to misconduct. The evidence of record indicates that these service members had secured from military duties prior to becoming passengers in the vehicle. Consequently, their UA status did not interfere with performance of duties.[7]

The Secretary of the Navy had delegated to the Chief of Naval Reserve the authority, with certain exceptions not applicable to this case, to determine eligibility for disability benefits for a Navy reservist and to issue the Notice of Eligibility for Disability Benefits (NOE). The Chief of Naval Reserve was required to review all of the information provided, *i.e.,* the Toomey Investigation Report and endorsements thereto, obtain any additional data as required, and make a determination as to the reservist's eligibility for disability benefits. If the reservist concerned was deemed eligible to receive the benefits authorized by 10 U.S.C. § 6148, the Chief of Naval Reserve was to prepare and forward to the reservist the NOE. In essence, the NOE is the basic

document used by disbursing officers for substantiation of entitlement to pay and allowances. *Secretary of the Navy Instructions* (SECNAVINST) 1770.3 ¶ 8 (August 17, 1973).

Plaintiff had sought disability benefits under 10 U.S.C. § 6148 subsequent to the incurrence of his injuries. On November 7, 1980, plaintiff's attorney wrote the Staff Judge Advocate, Chief of Naval Reserve, requesting a prompt determination of plaintiff's eligibility for disability benefits. In response to this request, the Staff Judge Advocate's office, by letter dated December 17, 1980, advised plaintiff's attorney that plaintiff was not eligible for disability benefits because at the time of the accident he was in an unauthorized absence status and thus the injuries he suffered were not incurred "in the line of duty" as required by 10 U.S.C. § 6148.

By letter dated January 9, 1981, plaintiff, through his attorney, appealed the denial of disability benefits by the Staff Judge Advocate to the Commander, Navy Military Personnel Command. In this letter plaintiff's attorney requested review and reversal of said denial by the Navy and requested information of the practices and procedures required or authorized in which he could be involved in deliberations on the matter for purposes of representing his client.[8]

On January 21, 1982, the Chief of Naval Reserve wrote to the Judge Advocate General (Code 12) as follows:

1. Subject member [plaintiff] was injured on 4 May 1980 while on inactive duty training (drill). Subject's request for disability benefits under reference (a) was denied since the line of duty investigating officer opened [sic] [opined] that subject was an unauthorized absentee at the time of the injury.

2. Subject member, through counsel, appealed the denial of benefits to Naval

---

7. The parties have stipulated and agreed, for purposes of this litigation that plaintiff was not unauthorized to be where he was at the time of the accident when he was injured.

8. A reservist denied benefits under 10 U.S.C. § 6148 by the Chief of Naval Reserve may appeal directly to the Secretary of the Navy (Judge Advocate General). SECNAVINST 1770.3, ¶ 12 (April 18, 1975).

Military Personnel Command who advised subject that the appeal should be directed to the Judge Advocate General (Code 12). Reference (b) indicates no appeal has been received.

3. Reference (c) advised that subject member had again made inquiry concerning eligibility for benefits. A review of enclosure (1) indicates the investigating officer's opinion that HN Andrews was an unauthorized absentee at the time of the injury is not supported by the enclosures to the investigation. Additionally, the tenth endorsement to enclosure (1) found that HN Andrews' injuries were incurred in the line of duty.

4. It is requested that this command be advised as to appropriate course of action to be taken.

In response to the January 21, 1982 request for advice, *supra,* the Judge Advocate General stated in pertinent part as follows:

3. The driver was charged with misappropriation of a Government vehicle, and all four, Andrews included, were placed on report for article 86, UCMJ, violations. Whether those charges actually culminated in the imposition of article 15 punishment cannot be determined from the endorsements. In the tenth endorsement the general court-martial convening authority acknowledges the unauthorized absence status of Andrews at the time of the accident but concludes that, since his absence did not *materially interfere* with the performance of required military duties, his injuries were determined to have been incurred in the line of duty and not due to misconduct. Reference (a) asks, in effect, whether the in-line-of-duty, not misconduct finding would entitle Andrews to a Notice of Eligibility for Disability Benefits (NOE) under the provisions of reference (b).

4. The "material interference" test for line-of-duty determinations, *JAG Manual,* section 0802d, is a rule essentially limited in its operation to cases involving active-duty members. In line-of-duty determinations involving inactive-Reserve members, section 0802d is, for practical purposes, preempted by other rules. *JAG Manual,* section 0812 and 0911, are the relevant sections pertaining to reservists. Those sections allude to the necessity of a two-pronged test under 10 U.S.C. § 6148 (1976) for entitlement to disability benefits: the injury must not only be incurred in the line of duty (not misconduct) but must also be incurred *while so employed* (in inactive-duty training). Over the years, various aspects of the "while so employed" requirement have been addressed in Comptroller General decisions as well as in opinions by this office.

5. The central question in this case is whether Andrews could be considered to be still in an inactive-duty-training status within the meaning of 10 U.S.C. § 6148 (1976), during the period between 1730 Saturday and 0730 Sunday. * * *

6. The factual situation described in the Comptroller General's decision, *Ms.Comp. Gen.* B–164204 (12 Jul 1968), appears very similar to the instant case: the guardsman in question had traveled with his unit to a camp some 100 miles distant from the home station for a weekend firing range exercise. The schedule provided for an "administrative bivouac" at the camp from 1700 Saturday until resumption of the exercise at 0530 Sunday. Thus, in both cases the plan of operation called for an overnight encampment as distinguished from a dismissal (which normally occurs when drills are conducted at the home training center. It is evident from the Comptroller General's decisions that in this "gray area"—where the guardsman or reservist is not literally engaged in training but has not been dismissed either—each case must be decided on its facts, the test being whether the member is still under military control. If Andrews' injury had occurred Saturday night within Camp Smith (and further supposing there had been no unauthorized use of a vehicle), then in all likelihood he could be deemed still in a training status. But if, as the Comptroller General has decided, a guardsman who departs camp with the express permission of his superior is considered no

longer in a training status, then certainly the same must be said of a reservist who departs training camp as an unauthorized absentee.

7. In view of the foregoing, it is the opinion of this office that your previous decision in this case, i.e., nonissuance of the NOE, was legally correct. In conveying this to HN Andrews, it is requested that you inform him that opinions of this office on pay matters are advisory only. As indicated by paragraph 13 of reference (b), he may, if he so chooses, submit his claim to the General Accounting Office via the chain of command.

An inactive duty Naval Reservist, like plaintiff, will be referred for disability evaluation only if he has been issued a NOE. SECNAVINST 1850.4, § 0223(a) (June 23, 1977). Since plaintiff was not issued a NOE he was never referred to a medical board or a physical evaluation board for disability evaluation. On May 17, 1982, plaintiff was honorably discharged from the military service after fulfilling his service obligation. On November 17, 1982, plaintiff filed his complaint [labeled "Petition"] in this court seeking entitlement to disability benefits.

## II.

■ Under 10 U.S.C. § 6148(a), plaintiff, as a reservist, is entitled to disability benefits if, while performing inactive-duty training under competent orders, he "is disabled in line of duty from injury while so employed * * *." The decision in this case turns on the interpretation and reach of the phrase "while so employed" and its application to the facts in this case. It is no easy task. Military departments, the General Accounting Office (GAO), and the courts have struggled with the application of this phrase to various factual situations. It is evident that the instant case rests in that "gray area" where each case must be decided on its own particular facts. *See Meister*

v. *United States,* 162 Ct.Cl. 667, 671–72, 319 F.2d 875, 878 (1963); *see also* 43 Comp.Gen. 412, 415 (1963).

It is conceded that at the time of the accident in which plaintiff was injured he was authorized to be where he was. *Compare McCray v. United States,* 3 Cl.Ct. 253 (1983). Further, there is no argument advanced by defendant that plaintiff was guilty of misconduct relative to the circumstances surrounding the accident. It is further conceded that plaintiff was in the line of duty at the time of the accident.[9]

Defendant's position, in opposition to plaintiff's claim, rests on its view that the phrase "while so employed" serves to limit the preceding phrase "in line of duty" in section 6148(a). Each of these phrases, defendant argues, must be given distinct meanings and to grant plaintiff relief herein would indicate there is no distinction between the two phrases. In such a case, defendant concludes, one of the phrases would be rendered inoperative or superfluous, a violation of a cardinal principle of statutory construction, citing, *inter alia, Crawford v. United States,* 179 Ct.Cl. 128, 139, 376 F.2d 266, 272 (1967), *cert. denied,* 389 U.S. 1041, 88 S.Ct. 781, 19 L.Ed.2d 831 (1968). One can accept the view that the phrase "while so employed" limits in some degree the broad reach of the phrase "line of duty." However, that acceptance does not solve the problem. The problem lies in interpreting the phrase "while so employed." The distinction between these two phrases is to be found in the factual circumstances which bring into play their application. *See Meister v. United States, supra,* 162 Ct.Cl. at 672, 319 F.2d at 878.

Defendant seeks to give a very restrictive interpretation to the phrase "while so employed." In defendant's view, this phrase should be interpreted to mean that a reservist would be entitled to disability benefits "only if the disability was the result of an

---

9. Under applicable regulations, an injury incurred by Naval personnel while in active service will be presumed to have been incurred "in line of duty," except in circumstances, *e.g.,* misconduct, desertion, absent without leave,

not here applicable. Active service as used in such regulations includes inactive-duty training. *See Manual Of The Judge Advocate General,* § 0802 (JAG Instruction 5800.7B).

injury incurred while the member was actually engaged in inactive duty training pursuant to competent orders." (Defendant's main brief, page 22.) [10] In support of this restrictive approach, defendant discusses what it deems to be the legislative history of section 1648(a) but advises it advances no legislative history interpretation of that section. In truth, the legislative history of section 6148(c) is not helpful in interpreting the meaning to be ascribed to the phrase "while so employed." This fact was noted in *Meister v. United States, supra,* where the Court of Claims observed: "[T]he term 'while so employed' admittedly is susceptible of more than one interpretation, and the Congress has not seen fit to make clear the exact connotation * * *." The court in *Meister* rejected the government's efforts to have section 6148(a), especially the term "while so employed" strictly construed and interpreted, and this court likewise rejects defendant's efforts in this case. [11]

■ Significant factors to consider in determining whether a reservist was injured "in the line of duty" and "while so employed" are the orders the reservist was operating under and the existence and interplay of applicable and/or controlling regulations, *see Adams v. United States,* 127

Ct.Cl. 470, 473–74, 118 F.Supp. 381, 383–84 (1954); *Vason v. United States,* 369 F.Supp. 1202, 1205 (1973), *aff'd.* 491 F.2d 1271 (5th Cir.1974), and whether at the time of injury the military had control of or the right to control the reservist, *see Meister v. United States, supra,* 162 Ct.Cl. at 672–73, 319 F.2d at 878.

In this case, plaintiff was ordered to muster at 10:00 p.m. on May 2, 1980, in Garden City, New York, and depart by bus for Camp Smith in Peekskill, New York, for inactive-duty training. Plaintiff's orders further provided that plaintiff was to be returned to Garden City on May 4, 1980, at which time his inactive-duty training would conclude. It is not unreasonable to read these orders as indicating plaintiff would be in "line of duty" and "so employed" on inactive-duty training for the period from 10:00 p.m. on May 2, 1980, until his return to Garden City on May 4, 1980.

Defendant, however, argues that plaintiff's injury occurred off-base, while on a "chow run," after training for the day had been secured at a time when, defendant contends, plaintiff was not under military control.

In defendant's view, the injury to plaintiff did not occur between muster and dis-

---

**10.** This restrictive view is not supported by certain rulings of the General Accounting Office (GAO) wherein injuries incurred by reservists on weekend drills during a lunchtime basketball game (Volpe), or during a handball game when no actual duty was being performed (Scott), or during a softball game played after the scheduled training for the day had been completed were deemed to have been incurred "while so employed." At the time of these injuries, the reservists were not "actually engaged in inactive-duty training." *See* 43 Comp.Gen. 412 (1963) and *James E. Williams,* B–156628 (June 1, 1965). In the *Volpe* and *Scott* situations, the GAO reasoned that the reservists were employed on inactive duty for the entire day from the time they mustered in for that duty until the end of the ordered period of such duty for that day. In the *Williams* case, the GAO reasoned that although the scheduled training for the day had been completed at the time of the reservist's injury, Williams should be deemed to be employed since he was required to remain in the bivouac area and was under military control.

**11.** In *Meister v. United States,* 162 Ct.Cl. 667, 672, 319 F.2d 875, 878 (1963), the court adopted the view that section 6148(a), "as well as other retirement statutes were enacted from motives of public policy and should not be narrowly construed." *See also Lemly v. United States,* 109 Ct.Cl. 760, 767, 75 F.Supp. 248, 252 (1948). The legislative history on section 6148(a) lends support to this view. *See* H.R.Rep. No. 582, 81st Cong., 1st Sess. 1, *reprinted in* 1949 U.S. Code Cong. & Ad.News 1379, 1380. In *Meister,* a reservist, ordered to be at a training center by 7:20 p.m., had entered the training compound and while proceeding to the drill hall to report as ordered slipped and was injured. This accident prevented him from mustering at 7:20 p.m. The Court of Claims held that the reservist was "within the scope of his assigned duties when he 'slipped'" and therefore was within the purview of 10 U.S.C. § 6148(c). The General Accounting Office does not agree with the court's conclusion in the *Meister* case and has suggested that any similar case based on facts a little more favorable to the government should be vigorously defended. 43 Comp.Gen. 412, 414–15 (1963).

missal since training activities for the day had been "administratively secured." Defendant relies on JAG Instruction 5800.7B at § 0911(a) which states, "Employment in inactive duty training (drill) normally includes only that period between muster and dismissal." However, by its terms, this statement is not categorical or absolute in defining the scope of inactive duty training. The use of the word "normally" indicates that inactive-duty training can embrace activities beyond the limits of muster to dismissal.[12] Accepting for purposes of argument the muster to dismissal rule, it is felt that plaintiff's injury can be viewed as falling within the limits of this rule. Plaintiff's orders clearly indicated he was in an inactive-duty training status from May 2, 1980, when he departed Garden City, New York, at 10:00 p.m. for Camp Smith, viewed as muster, and that he would remain in such a status until he returned to Garden City, New York, from Camp Smith at 11:00 a.m. on May 4, 1980, viewed as dismissal. On this record, this is felt to be a sensible, rational and reasonable reading of plaintiff's orders. Accordingly, plaintiff's injury can be deemed to have occurred between muster on May 2, 1980, and scheduled dismissal on May 4, 1980.

Defendant next maintains that plaintiff's injury occurred off-base at a time when plaintiff was pursuing his own interests, i.e., getting something to eat. It is conceded plaintiff was not precluded by regulation or order from leaving the base for purposes of eating. It is also clear plaintiff was not on official liberty, i.e., operating on an official pass. The record indicates plaintiff had base liberty; yet, it is conceded he had the right to be where he was off-base at the time of the accident. He left the base in a military vehicle,[13] wearing military fatigues or utilities, and was returning to the base after eating, all of which manifest plaintiff's recognition of military control and military business. The record indicates plaintiff did not stay too long at the restaurant before leaving to return to the base. See Meister v. United States, supra, 162 Ct.Cl. at 672, 319 F.2d at 878. The record at hand indicates that leaving the base in military vehicles to eat off-base was a common occurrence on the evening of May 3, 1980. There were no regulations or orders prohibiting such trips. Further, it is not without some significance that mess hall facilities were not provided plaintiff's training unit at Camp Smith, and the Saturday (May 3) noon and evening meals consisted of C-Rations. Given the loose eating arrangements and in the absence of applicable standards, orders or guidelines relative thereto (see note 6 and text, supra), it is not unreasonable to conclude, under circumstances existing at the time, that the "chow run" took place while plaintiff was within the scope of his assigned duties. See Meister v. United States, supra, 162 Ct.Cl. at 673, 319 F.2d at 879.

Defendant stresses the fact that the injury was incurred off-base and thus the de-

---

**12.** This is the basic test the GAO uses in determining whether an injured reservist falls within the term "while so employed." See 43 Comp. Gen. 412, 415 (1963). Where weekend drills are involved, i.e., several days of drills or multiple drills, the GAO treats the inactive-duty training period as encompassing the period from the time the reservist is first mustered in the morning until the end of his scheduled inactive-duty training for that day. See Walter B. Smith, B–164204 (July 12, 1968). However, the GAO expanded this test in James E. Williams, B–156628 (June 1, 1965), where the reservist was injured after completion of the day's scheduled inactive-duty training but the injury was deemed to have occurred while the reservist was so employed because he was in the bivouac area under military control. Accordingly, the muster-dismissal rule is not viewed as absolute by GAO in all situations.

**13.** While there is some indication in the record that use of the military vehicle was not authorized, there is no evidence that plaintiff was aware that such use was unauthorized. Indeed, one of the senior non-commissioned officers who noticed the vehicle leaving the base felt at the time that the driver was authorized to leave the base with the vehicle. Moreover, the record does not indicate whether or not the marine driver of the vehicle, which he was authorized to use during the training period, was punished for any such infraction. See notes 3 and 6, supra. On this record, there is no basis for concluding that the use of the vehicle in question was unauthorized for "chow run" purposes.

gree of proximity of plaintiff to his employer-unit at Camp Smith at the time of the accident should serve as conclusive evidence that the accident did not occur while plaintiff was so employed. In this regard, defendant seeks to gain support from the discussion in *Meister v. United States, supra,* relative to determining the existence of a state of employment of the reservist in that case. In the context of the *Meister* facts, it is obvious that "proximity" was used with reference to the time the employment status was created. *See* note 11, *supra.* In this case, as previously stated, the employment status was created on May 2, 1980, when plaintiff boarded the bus for Camp Smith, as ordered, and was to be terminated on May 4, when he returned from Camp Smith. Further, relative to the term "proximity," in *Meister* the Court of Claims noted that the reservist was heading toward his duty muster station. Here plaintiff was returning to base.

It is true, of course, that had the injury occurred on-base plaintiff's case would have been much stronger. However, even if "proximity" *i.e.,* the injury occurred off-base, is deemed an important consideration in this case, "proximity" was only one of two factors, the other was "manifestations of the employee's intentions,"[14] the Court of Claims considered in *Meister v. United States, supra,* as embodying "the classic common law test of the master-servant relationship—whether the employer has 'control or right to control' the employee." 162 Ct.Cl. at 672–73, 319 F.2d 878. (Footnote omitted.)

On this record, it is concluded that at the time of the accident the military clearly had the right to control plaintiff. It cannot be doubted that had plaintiff left Camp Smith without authorization he would have been subject to military disciplinary action. He was billeted at Camp Smith and was expected to be there at all times unless authorized to be elsewhere. *See Meister v. United States, supra,* 162 Ct.Cl. at 673, 319 F.2d at 878–79; *Adams v. United States, supra,* 127 Ct.Cl. at 474, 118 F.Supp. at 384. The fact that, under existing mess conditions, he was permitted to leave the base on a short duration "chow run" does not deprive the military of its control over or its right to control plaintiff during such short periods. It cannot be said that plaintiff reverted to his normal civilian status during this abbreviated "chow run" so as to be outside the pale of section 6148(a). *See* 43 Comp.Gen. at 415.

In *Meister v. United States, supra,* 162 Ct.Cl. at 672, 319 F.2d at 878, the Court of Claims stated that section 6148(a) was "enacted from motives of public policy and should not be narrowly construed * * * " and held that this principle required that reservists such as plaintiff be brought "within the meaning of the statute if we [the court] may do so without doing violence to the language." It is felt that the determination reached in this very close and troublesome case[15] that plaintiff was in an in-active duty training status when injured does not do violence to the language of section 6148(a). Instead, it gives recognition to the view that in this very gray area,

14. As indicated previously, plaintiff clearly manifested intentions to be doing his employer's business and clearly recognized his employer's control over him. Plaintiff left on a "chow run" in a military vehicle in combat fatigues or military dress, spent a short period in eating, and thereafter set about returning to base. The accident occurred while returning to base. Defendant argues that plaintiff could have done anything he wanted after leaving the base. However, there is no record support for this speculation. The facts are that plaintiff was on a relatively short duration "chow run" which, on this record, is deemed to have been authorized. There is no evidence plaintiff was authorized to be off-base for any other reason.

15. A review of the administrative progression of this case, set forth, *supra,* indicates the differing views of the various endorsing officials. Those officials who opposed plaintiff's entitlement to section 6148(a) benefits seemingly were motivated to do so under the assumption plaintiff was in an unauthorized absence status at the time of the accident. As indicated previously, it has been stipulated that plaintiff was authorized to be where he was at the time of the accident. Had this stipulation been operative at the administrative level, this litigation may never have surfaced.

the factual circumstances of each case dictate whether an injured reservist falls within, or is outside, the pale of section 6148(a). The holding herein is applicable to the particular facts of this case and no other.

Having concluded that plaintiff is entitled to disability benefits under section 6148(a), the matter must be remanded to the Secretary of the Navy for such entitlement determinations. Whether or not plaintiff is entitled, for example, to disability retirement is a determination that must be made in the first instance by an appropriate administrative medical board. *See Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 539–540, 97 L.Ed. 842 (1953); *Unterberg v. United States,* 188 Ct.Cl. 994, 1001, 412 F.2d 1341 (1969).

### III.

In view of the above discussion, it is determined that plaintiff is entitled to recover and that, accordingly, plaintiff's motion for summary judgment is granted. To determine the amount, if any, and the relief, if any, that plaintiff is entitled to recover, IT IS ORDERED that this case be remanded, pursuant to RUSCC 60.1(a), to the Secretary of the Navy with directions to:

(1) issue promptly a Notice of Eligibility (NOE) to plaintiff so that he may be referred to an appropriate board for disability evaluation;

(2) determine what other and additional disability benefits are due plaintiff under the holding reached herein that plaintiff is entitled to receive all the benefits provided for by 10 U.S.C. 6148(a) (1976);

(3) complete the proceedings and determinations called for by this remand order within a period of six months, beginning with the date of this opinion and remand order, during which period court proceedings in this case shall be stayed.

IT IS FURTHER ORDERED that the attorney of record for the plaintiff shall report to the court the status of proceedings on remand at intervals of 60 days, beginning with the date of this opinion and remand order.